UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | CRIMINAL NO. 10-30002-MAP |
| ) | |
| v. ) | VIOLATION: |
| ) | |
| SCOTT REUBEN, ) | 18 U.S.C. §1347 (health care fraud) |
| ) | |
| Defendant. ) | |

## INFORMATION

The United States Attorney charges that:

### PRELIMINARY ALLEGATIONS

At all times material hereto, unless otherwise alleged:

### The Defendant

1. The defendant **SCOTT REUBEN** ("**REUBEN**") was a resident of Longmeadow, Massachusetts, and employed as an anesthesiologist in Springfield, Massachusetts.

### Background

2. Beginning no later than 1991, **REUBEN** worked as an anesthesiologist and provided anesthesia services to patients in connection with surgeries, and also treated patients post-surgery. At various times material hereto, **REUBEN** was the chief of acute pain at a hospital in Western Massachusetts (the "Hospital").

3. **REUBEN** also maintained an office at the Hospital for the purposes of conducting research and, at various times, **REUBEN's** employer allowed him to spend one day per work

1

week on research rather than treating patients.

4. **REUBEN** had a particular interest, from a research perspective, in post-operative multimodal analgesia therapy, meaning a combination of analgesia drug therapy instead of the use of opioids. **REUBEN's** theory was that multimodal analgesia therapy would be as effective for pain, promote long term healing and avoid some of the side effects associated with opioid therapy.

5. For years, the traditional pain treatment for many patients after a surgery, such as hip or knee surgery, was treatment with opioids, such as morphine. The concept of replacing opioids with a multimodal analgesia regimen, of which **REUBEN** was a proponent, was a subject of debate within the anesthesia and pain medical community. On one side of the debate were physicians like **REUBEN** who believed that similar pain treatment could be achieved without the adverse side effects from opioid drugs. However, others questioned whether: (a) some of the drugs used in the multimodal analgesia therapy were safe for bone-healing; (b) the multimodal approach was as effective in terms of functional improvements after certain surgeries like anterior cruciate ligament surgery; and (c) the multimodal approach was as effective in dealing with chronic pain.

6. At various times, **REUBEN** made proposals for research funding (including free drugs) to pharmaceutical companies which manufactured drugs that he used or proposed to use in multimodal analgesia therapy. Those drugs included the drug Vioxx, manufactured by Merck & Co., Inc. ("Merck"), and the drug Celebrex, manufactured by Pfizer, Inc ("Pfizer"). In making his proposals to these pharmaceutical companies, including Merck and Pfizer, **REUBEN** represented that he, as the principal investigator, would be performing clinical studies with actual patients to

whom he would administer the drug that was the subject of the research grant. The research grant proposals and the contracts regarding the research grants also contemplated that **REUBEN** would prepare an article to submit for publication in a medical journal based on the results of the research study.

7. By no later than 2001 and for several years that followed, **REUBEN** had become a well known figure in the anesthesia and pain management medical communities. He had published numerous articles in medical journals relevant to those communities and was a regular on the medical lecturing circuit, speaking at medical conferences, continuing medical education events and to groups of physicians in promotional settings. Among the topics of his articles and lectures was post-operative multimodal analgesia therapy.

8. For many years, but at least as early as 1999, **REUBEN** made proposals to pharmaceutical companies to perform research studies, entered into contracts to perform research as funded by the pharmaceutical companies, purported to perform the research called for by the contract, and published articles in various medical journals based on the purported results of the research, when in fact those studies had not been performed, and therefore the research results reported in the medical journals were false.

9. In or about July 2005, **REUBEN** proposed to Pfizer that he would perform research on the topic of "Perioperative Administration of Celecoxib [Celebrex] as a Component of Multimodal Analgesia for Outpatient Anterior Cruciate Ligament Reconstruction Surgery." In his proposal, **REUBEN** informed Pfizer that the "goal of this study is to assess the analgesic efficacy of utilizing celecoxib in a preemptive multimodal analgesic technique for patients undergoing

outpatient ACL surgery," and that he intended to include 100 patients in the study, with 50 of them randomized to receive Celebrex and 50 or them to receive a placebo.

10. On or about September 1, 2005, **REUBEN** entered into an Independent Research Grant Agreement (the "Agreement") with Pfizer to conduct a clinical research study entitled "Perioperative Administration of Celecoxib [Celebrex] as a Component of Multimodal Analgesia for Outpatient Anterior Cruciate Ligament Reconstruction Surgery." As part of that Agreement, which was signed by **REUBEN**, Pfizer agreed to provide (and indeed paid) a research grant in the amount of $73,512.00 and sufficient supplies of Celebrex and placebo to conduct the study. As such, for the purpose of the Agreement, Pfizer was a health care benefit program as defined by 18 U.S.C. §24(b).

11. **REUBEN's** protocol for the study was to treat 100 patients, with 50 receiving placebo and 50 receiving Celebrex as part of the multimodal analgesia therapy. In the articles published by **REUBEN** about this study ("Evaluating the Analgesic Efficacy of Administering Celecoxib as a Component of Multimodal Analgesia for Outpatient Anterior Cruciate Ligament Reconstruction Surgery," Vol. 105: 222-227, 2007 Anesthesia & Analgesia; and "The Effect of Initiating a Preventive Multimodal Analgesic Regimen on Long-Term Patient Outcomes for Outpatient Anterior Cruciate Ligament Reconstruction Surgery," Vol. 105: 228-232, 2007 Anesthesia & Analgesia), he claimed to have treated 200 patients, 100 with placebo and 100 with Celebrex. **REUBEN** also claimed in these articles that patients had achieved success with multimodal analgesia therapy.

12. In fact, **REUBEN** had not enrolled any patients into that study and the results reported

both to Pfizer and to Anesthesia & Analgesia Journal and in turn to the public were wholly made up by **REUBEN** and therefore false.

    13. In January 2007, **REUBEN** sent or caused to be sent to Anesthesia & Analgesia Journal Copyright Assignments so that the articles referenced above, manuscripts of which had already been submitted by **REUBEN** to Anesthesia & Analgesia Journal, could be published.

## COUNT ONE (18 U.S.C. §1347 HEALTH CARE FRAUD)

14. Paragraphs 1 through 13 of this Information are herein realleged and incorporated by reference.

15. In or about January 2007 in the District of Massachusetts, the defendant

## SCOTT REUBEN

defendant herein, knowingly and willfully executed a scheme and artifice to defraud Pfizer, Inc., a health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services,

All in violation of Title 18, United States Code, Section 1347.

## FORFEITURE ALLEGATIONS
### (18 U.S.C. § 982(a)(7))

16. Upon conviction of the offense alleged in Count One of this Information, the defendant

**SCOTT REUBEN**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes, or is derived from, proceeds traceable to the commission of the offense. The property to be forfeited by the defendant includes, but is not limited to, at least $50,000.

17. If any of the property described in paragraph 16 hereof as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(7), as a result of any act or omission of the defendant --

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred to, sold to, or deposited with a third party;

    c. has been placed beyond the jurisdiction of this Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b)(1), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of all other property of the defendant up to the value of the property described in subparagraphs a through e of this paragraph.

All pursuant to Title 18, United States Code, Section 982.

                    Respectfully submitted,

                    CARMEN M. ORTIZ
                    UNITED STATES ATTORNEY

By:   /s/ Jeremy M. Sternberg
       Jeremy M. Sternberg
       Assistant U.S. Attorney